IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IZZY WHITEHURST,                            :
                                            :
                    Petitioner,             :
                                            :
        v.                                  :        Civil Action No. 18-107-RGA
                                            :
ROBERT MAY, Warden, and                     :
ATTORNEY GENERAL OF THE                     :
STATE OF DELAWARE,                          :
                                            :
                    Respondents.[1]         :
_____

### MEMORANDUM OPINION

Izzy Whitehurst.  *Pro se* Petitioner.

Martin B. O'Connor, Deputy Attorney General of the Delaware Department of Justice,
Wilmington, Delaware.  Attorney for Respondents.

March 11, 2021
Wilmington, Delaware

_____

[1]Warden Robert May has replaced former Warden Dana Metzger, an original party to the case.
*See* Fed. R. Civ. P. 25(d).

/s/ Richard G. Andrews
ANDREWS, UNITED STATES DISTRICT JUDGE:

Pending before the Court is Petitioner Izzy Whitehurst's Application for a Writ of Habeas

Corpus Pursuant to 28 U.S.C. § 2254 ("Petition").  (D.I. 1)  The State filed an Answer in

opposition, contending that the Petition should be dismissed in its entirety.  (D.I. 9)  For the

reasons discussed, the Court will dismiss the Petition.

## I.      BACKGROUND

### A.  Factual Background

As summarized by the Delaware Supreme Court in Petitioner's direct appeal, the facts

leading up to Petitioner's conviction are as follows:

> On the night of October 19, 2011, Erogers Bey ("Bey") pulled into
> the parking lot of the Budget Inn, located in New Castle County,
> Delaware.  People noticed that he was intoxicated, waving around a
> lot of cash, and generally attracting attention.  When the residents
> of the Budget Inn saw Bey, they saw him as an easy mark.  Jessica
> "Bella" Harvey, ("Harvey"), who lived in room 109 and worked as
> a prostitute, noticed Bey, and, along with Tasha "China" Mahaley
> ("Mahaley"), spoke to him at his car. Both wanted to "date" Bey.
>
> [Petitioner] and Mahaley, his girlfriend and mother of his child,
> approached [Petitioner's] friend of thirty years, Tyrone "Uncle
> Butters" Brown ("Brown"), and asked him if he had a gun because
> [Petitioner] was "going to knock off the joker around the corner."
> Brown told [Petitioner] he did not have a gun and went back to his
> room.  [Petitioner] also approached Chris White ("White") and told
> him that they should "get" or rob Bey.  White refused.
>
> Budget Inn's video surveillance, which the police watched with a
> Budget Inn clerk, showed that Mahaley left room 211, which she
> shared with [Petitioner] and their child, and went downstairs into
> room 109.  An unknown black male then left room 109 and walked
> towards Memorial Drive and met another person. The unknown
> Black male who had been in room 109 left the area, but Mahaley
> and the other individual, a Black male with dreadlocks, walked back
> towards room 109.

2

Mahaley then went back to her room, room 211, while the Black male stood outside of room 109. A moment later, [Petitioner], wearing a Black hooded sweatshirt, exited room 211, walked down the steps and met up with the Black male outside of room 109. They lined up in a tactical formation along the wall with [Petitioner] behind the other man, who was holding a gun.

Bey was inside room 109 with Harvey. After Harvey's dealer had delivered drugs to her, they heard [Petitioner] knock on the door. Harvey opened the door, and [Petitioner] pushed his way into the room. A gun barrel prevented Harvey from closing the door. Another resident, Deborah Pyle heard a gunshot from within room 109 a minute or so before seeing [Petitioner] and the other man run out of the room.

As soon as Harvey saw the man with a gun, she barricaded herself in the bathroom. She heard a commotion, including Bey "asking for whatever was happening to stop." She also heard Bey say, "Izzy, why are you doing this?" When the noise stopped for a moment, Harvey opened the door a crack and peeked out. She saw [Petitioner] on top of Bey and the man with the gun was beating Bey's head with the gun butt. [Petitioner] was "running Bey's pockets." Harvey closed the door again. Later, Harvey came out of the bathroom and saw Bey, covered in blood, rolling around the floor mumbling incoherently. She left to tell Mahaley what had happened. Mahaley grabbed her cell phone and left the Budget Inn.

Bey, missing his cellphone and keys, went to the Budget Inn office to call friends to get him. Bey then saw Harvey running in the parking lot and ran after her. Harvey made her way to the Budget Inn office, and another resident of the Budget Inn prevented Bey from entering the office after Harvey.

The Budget Inn clerk called 911. When the police arrived, they questioned Harvey, who said she did not know who had been chasing her, and that person was gone. Officers looked at the security tape and it showed Harvey in the lobby and White blocking Bey from entering after her. There were no reports of any shots fired, or injuries to anyone.

Officer Michael Rief ("Officer Rief"), a patrol officer assigned to the area of the Budget Inn, returned on routine patrol about an hour after being sent in response to the 911 call. He noticed White in the

parking lot and stopped to talk to him about the earlier incident. While the two were talking, Bey came around the corner and said, "I've been robbed." Officer Rief asked Bey, who was unknown to the officer, to wait until he finished his conversation with White. Bey said it did not matter. As he walked away, White mentioned that Bey was the man he was trying to keep out of the lobby.

Bey was eventually brought to the Christiana Hospital emergency room by two women around 1 a.m. Linda Ramsey ("Ramsey"), a forensic nurse, was on duty. Through her training, Ramsey was able to identify that Bey's head had both a gunshot entry wound and an exit wound. Bey also had other wounds to his hand and elbow.

Officer Brian Crisman ("Officer Crisman") was with Bey when he regained consciousness around 5 a.m. Bey mumbled that he had driven to a motel across from the Travel Lodge and been jumped by two black men who took $600 in cash, a phone and the keys to his vehicle. He also told Officer Crisman that one of the men who jumped him was [Petitioner].

Detective Anthony Tenebruso was the first officer to arrive at the Budget Inn in response to the Christiana Hospital's report. Other officers arrived within the next hour. Detective Lano photographed the crime scene in room 109 and collected a black coat found in a trash can outside of room 109. Detective Lano also collected samples from bloodstains on the carpet and on the tile floor outside the bathroom in room 109. The police were not able to recover any drugs, guns, bullets or shell casings from room 109. Numerous people had been through the room before the police were called and learned it was a crime scene.

After the police obtained search warrants, Detective Lano returned to the Budget Inn and took photographs of rooms 211 and 216. He also collected a black sweatshirt from room 211, which contained bloodstains that belonged to Bey. Skin cells collected from the interior of the cuffs of the same sweatshirt contained [Petitioner's] DNA, and he admitted that it was his. Bey's blood was determined to be on the carpet in room 109.

*Whitehurst v. State*, 83 A.3d 362, 363–65 (Del. 2013).

### B. Procedural Background

4

Petitioner was arrested on October 20, 2011 in connection with the robbery of Bey.  (D.I. 13 at 9)  He was indicted on December 19, 2011 and charged with one count of first degree robbery, one count of attempted first degree murder, one count of first degree burglary, one count of second degree conspiracy, three counts of possession of a firearm during the commission of a felony ("PFDCF"), and one count of possession of a firearm by a person prohibited ("PFBPP").  (D.I. 12-4 at 2, Entry No. 8; D.I. 13-12 at 30-34) He was re-indicted on August 13, 2012 to add two counts of tampering with a witness.  (D.I. 12-4 at 9, Entry No. 42; D.I. 13-12 at 31-39)

Petitioner filed several pre-trial motions, including an August 17, 2012 motion to suppress his recorded prison phone calls.  (D.I. 13-1 at 9 at Entry No. 25; D.I. 13-1 at 12, Entry Nos. 44, 45)  On September 24, 2012, Petitioner was re-indicted on charges of attempted first degree murder, three counts of PFDCF, first degree robbery, first degree burglary, two counts of second degree conspiracy, PFBPP, and three counts of tampering with a witness.  On October 3, 2012, Petitioner filed a memorandum in support of the motion to suppress, to which the State filed a reply.  (D.I. 9  at 2; D.I. 12-4 at 12, Entry No. 68)  On October 12, 2012, after a hearing, the Superior Court denied Petitioner's motion to suppress the prison phone calls.  (D.I. 12-4 at 14, Entry No. 87; D.I. 13-1 at 21-40)

On October 16, 2012, the State entered a *nolle prosequi* on the charge of PFBPP, and Petitioner's trial began.  (D.I. 13-1 at 18, Entry No. 103)  On October 26, 2012, a Superior Court jury found Petitioner guilty of first degree assault (lesser-included offense of attempted first degree murder), first degree robbery, first degree burglary, second degree conspiracy, three counts of PFDCF, and three counts of tampering with a witness.  (D.I. 9 at 2;  D.I. 13-1 at 18,

Entry No. 103)  The Superior Court sentenced Petitioner on March 15, 2013 to a total of forty-two years at Level V incarceration, suspended after thirty-three years and six months for decreasing levels of supervision.  (D.I. 12 at 36-41; D.I. 13-1 at 19, Entry No. 112)  Petitioner appealed, and the Delaware Supreme Court affirmed Petitioner's conviction on December 20, 2013.  *See Whitehurst v. State*, 83 A.3d 362 (Del. 2013).

Petitioner filed a motion for postconviction relief pursuant to Delaware Superior Court Criminal Rule 61 ("Rule 61 motion") on April 14, 2014.  (D.I. 12-4 at 19, Entry No. 134; D.I. 13-11 at 7)  Although the Superior Court appointed counsel to represent Petitioner, counsel filed a motion to withdraw from representation along with a detailed memorandum in support of that motion.  (D.I. 13-11)  The Superior Court denied the Rule 61 motion on March 31, 2016 while simultaneously granting counsel's motion to withdraw.  *See State v. Whitehurst*, 2016 WL 1424502, at *12 (Del. Super. Mar. 31, 2016).  The Delaware Supreme Court affirmed that decision on November 16, 2016.  *See Whitehurst v. State*, 151 A.3d 897 (Table), 2016 WL 6803774 (Del. Nov. 16, 2016).

Petitioner filed a habeas petition in this Court on May 9, 2017.  (*See Whitehurst v. Phelps*, Civ. Act. No. 17-558-RGA at D.I. 1)  After being notified that the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applied to his petition, and that AEDPA imposed procedural limitations on a prisoner's ability to file subsequent habeas corpus petitions, Petitioner withdrew his application so that he could file one, all-inclusive application.  (*See id*. at D.I. 4) On October 18, 2017, this Court dismissed Petitioner's petition without prejudice.  (*See id*. at D.I. 7)

6

On January 14, 2018, Petitioner filed the instant Petition, and it was assigned a new civil action number.

## II.      GOVERNING LEGAL PRINCIPLES

### A.  Exhaustion and Procedural Default

A federal court may consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Absent exceptional circumstances, a federal court cannot grant habeas relief for a claim challenging the validity of the petitioner's state custody unless the petitioner has exhausted all means of available relief under state law.  *See* 28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-44 (1999); *Picard v. Connor*, 404 U.S. 270, 275 (1971).  The AEDPA states, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that –
>
> (A) the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)(i) there is an absence of available State corrective process; or
>     (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The exhaustion requirement is based on principles of comity, requiring a petitioner to give "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan*, 526 U.S. at 844-45; *see Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000).  A petitioner satisfies the

exhaustion requirement by demonstrating that the habeas claims were "fairly presented" to the state's highest court, either on direct appeal or in a post-conviction proceeding, in a procedural manner permitting the court to consider the claims on their merits. *Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005); *Castille v. Peoples,* 489 U.S. 346, 351 (1989).

A petitioner's failure to exhaust state remedies will be excused if state procedural rules preclude him from seeking further relief in state courts. *See Lines v. Larkins,* 208 F.3d 153, 160 (3d Cir. 2000); *Teague v. Lane,* 489 U.S. 288, 297-98 (1989). Although treated as technically exhausted, such claims are nonetheless procedurally defaulted. *See Lines,* 208 F.3d at 160; *Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991). Similarly, if a petitioner presents a habeas claim to the state's highest court, but that court "clearly and expressly" refuses to review the merits of the claim due to an independent and adequate state procedural rule, the claim is exhausted but procedurally defaulted. *See Coleman*, 501 U.S. at 750*; Harris v. Reed*, 489 U.S. 255, 260-64 (1989).

Federal courts may not consider the merits of procedurally defaulted claims unless the petitioner demonstrates either cause for the procedural default and actual prejudice resulting therefrom, or that a fundamental miscarriage of justice will result if the court does not review the claims. *See McCandless v. Vaughn,* 172 F.3d 255, 260 (3d Cir. 1999); *Coleman,* 501 U.S. at 750-51. To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488 (1986). To demonstrate actual prejudice, a petitioner must show "that [the errors at trial] worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494.

Alternatively, a federal court may excuse a procedural default if the petitioner demonstrates that failure to review the claim will result in a fundamental miscarriage of justice. *See Edwards v. Carpenter,* 529 U.S. 446, 451 (2000); *Wenger v. Frank,* 266 F.3d 218, 224 (3d Cir. 2001). A petitioner demonstrates a miscarriage of justice by showing a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray,* 477 U.S. at 496. Actual innocence means factual innocence, not legal insufficiency. *See Bousley v. United States*, 523 U.S. 614, 623 (1998). In order to establish actual innocence, the petitioner must present new reliable evidence – not presented at trial – that demonstrates "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 537-38 (2006); *see Sweger v. Chesney,* 294 F.3d 506, 522-24 (3d Cir. 2002).

### B.  Standard of Review

If a state's highest court adjudicated a federal habeas claim on the merits, the federal court must review the claim under the deferential standard contained in 28 U.S.C. § 2254(d). Pursuant to 28 U.S.C. § 2254(d), federal habeas relief may only be granted if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or the state court's decision was an unreasonable determination of the facts based on the evidence adduced in the trial. 28 U.S.C. § 2254(d)(1) & (2); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001).

A claim has been "adjudicated on the merits" for the purposes of 28 U.S.C. § 2254(d) if the state court decision finally resolves the claim on the basis of its substance, rather than on a

9

procedural or some other ground.  *See Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009).  The

deferential standard of § 2254(d) applies even "when a state court's order is unaccompanied by

an opinion explaining the reasons relief has been denied."  *Harrington v. Richter*, 562 U.S. 86,

98 (2011).  As explained in *Harrington*, "it may be presumed that the state court adjudicated the

claim on the merits in the absence of any indication or state-law procedural principles to the

contrary." *Id.* at 99.  The Supreme Court expanded the purview of the *Richter* presumption in

*Johnson v. Williams*, 568 U.S. 289 (2013).  Pursuant to *Johnson*, if a petitioner has presented the

claims raised in a federal habeas application to a state court, and the state court opinion addresses

some but not all of those claims, the federal habeas court must presume (subject to rebuttal) that

the state court adjudicated the unaddressed federal claims on the merits.  *Id*. at 298-301.  The

consequence of this presumption is that the federal habeas court will then be required to review

the previously unaddressed claims under § 2254(d) whereas, in the past, federal habeas courts

often assumed "that the state court simply overlooked the federal claim[s] and proceed[ed] to

adjudicate the claim[s] *de novo*."  *Id*. at 292-93.

Finally, when reviewing a habeas claim, a federal court must presume that the state

court's determinations of factual issues are correct.  *See* 28 U.S.C. § 2254(e)(1).  This

presumption of correctness applies to both explicit and implicit findings of fact, and is only

rebutted by clear and convincing evidence to the contrary.  *See* 28 U.S.C. § 2254(e)(1);

*Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir. 2000); *Miller-El v. Cockrell*, 537 U.S. 322, 341

(2003) (stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues,

whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions).

## III.    DISCUSSION

Petitioner's timely filed § 2254 Petition asserts four grounds for relief: (1) the State lacked a legal and factual basis to subpoena his recorded prison phone calls; (2) the Superior Court erred by denying Petitioner's motion to suppress the recorded prison phone calls, and the admission of those phone calls tainted his trial; (3) the Superior Court erred by refusing to give a missing evidence instruction; and (4) the Superior Court erred by denying Petitioner's motion to suppress as hearsay Detective Rizzo's testimony concerning a key witness' identification of Petitioner.  (D.I. 1)

### A. Claim One:  The State Lacked a "Legal Factual" Basis to Subpoena Petitioner's Prison Phone Calls

During the trial preparation in this case, victim Erogers Bey ("Bey") informed Delaware State Police Detective Steven Rizzo that he had received a phone call from Petitioner's girlfriend, Mahaley, asking him if he was going to go to court and "trying to persuade him not to go." *Whitehurst*, 83 A.3d at 366.  As a result, law enforcement was concerned Petitioner was tampering with the State's witnesses.  *Id*.  One day after the witness prep meeting with Bey, the State subpoenaed Petitioner's prison phone calls.  *Id*.

Petitioner filed a motion to suppress the recorded phone calls, arguing that the State had illegally obtained his recorded prison phone calls because there were insufficient facts to justify the issuance of a subpoena.  (D.I. 13 at 5-6, 12-13)  After conducting a hearing, the Superior Court denied the motion to suppress.  (D.I. 13-1 at 21-40)  The recorded phone calls were admitted during Petitioner's trial.

On direct appeal, Petitioner challenged the Superior Court's denial of his suppression motion, specifically alleging that there was an insufficient factual basis for the issuance of the subpoena.  (D.I. 13)  The State construed Petitioner's argument as alleging that the Superior

Court erred in denying his suppression motion because the subpoena for his phone calls violated his rights under the First and Fourth Amendments.  (D.I. 13-3 at 14-15)  The State viewed Petitioner's argument to be that the subpoena had been improperly issued under the standard articulated in *Procunier v. Martinez*,[2] which the Delaware Supreme Court had adopted as the standard for assessing the reasonableness of a subpoena for an inmate's outgoing prison communications in its 2009 decision in *Shannon Johnson v. State*, 983 A.2d 904 (Del. 2009).[3]

---

[2]The Supreme Court case*, Procunier v. Martinez*, established that prison officials cannot censor outgoing inmate mail merely because it contains: exaggerated complaints; magnified grievances; expressions of inflammatory political, racial or religious views; unwelcome criticism of policies, rules or officials; or disrespectful comments. *See Procunier v. Martinez*, 416 U.S. 396, 415–16 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989).

[3]In *Shannon Johnson v. State*, the Delaware Supreme Court opined that the State's subpoena of an inmate's prison calls implicates both First and Fourth Amendment considerations. *See Shannon Johnson v. State*, 983 A.2d 904 (Del. 2009) (analyzing subpoena of out-going mail under First and Fourth Amendment) (*Johnson I*); *Tywann Johnson v. State*, 53 A.3d 302 (Table), 2012 WL 3893524 (Del. Sept. 7, 2012) (applying First Amendment test adopted in *Johnson I* to recorded prison phone calls) (*Johnson II*); *State v. Tywann Johnson*, 2011 WL 4908637 (Del. Super. Ct. Oct. 5, 2011) (applying First Amendment and Fourth Amendment tests analyzed in *Johnson I* to recorded prison phone calls.).  After thoroughly reviewing "the varied approaches taken by the Circuit courts in light of somewhat unclear United States Supreme Court precedents," the Delaware Supreme Court held:

> [W]e adopt the approach taken by the Third Circuit—recognizing that the distinctions between incoming and outgoing mail are significant.  Accordingly, we will apply the [*Procunier v. Martinez*] standard to any action taken regarding an inmate's unprivileged outgoing mail as the proper analysis. To survive this scrutiny, we must determine that: (1) the contested actions furthered an important or substantial government interest unrelated to the suppression of expression; and (2) the contested actions were no greater than necessary for the protection of that interest.

*Johnson I*, 983 A.2d at 917.

12

(D.I. 13-3 at 16-26)  Petitioner did not contradict the State's construction of his appellate argument.  (D.I. 13-4)

In its appellate decision for Petitioner's case, the Delaware Supreme Court viewed Petitioner's argument as alleging that the Superior Court improperly denied the suppression motion because the subpoena for Petitioner's prison phone calls failed to satisfy the *Procunier v. Martinez* standard as articulated in *Johnson I.  See Whitehurst,* 83 A.3d at 363, 367-68.  The Delaware Supreme Court explained that, under Delaware precedent, since "there is a legitimate or substantial governmental interest if the defendant is engaged in witness tampering," "[t]his governmental interest falls within the category of security concerns that the inmate is engaged in 'ongoing criminal conduct.'" *Id.* at 367.  The Delaware Supreme Court concluded that the State had satisfied the *Procunier v. Martinez* standard, because "[a]n on-going investigation in one crime and the investigation of a potential subsequent crime, witness tampering, fall within the important government interest of investigating and preventing criminal activity." *Id.*  The Delaware Supreme Court also concluded, "there is no indication that the State's recording activities were greater than necessary to further its investigatory efforts." *Id*. at 368.  Based on this analysis, the Delaware Supreme Court held that: (1) the State's efforts to record and collect Petitioner's prison phone calls did not violate his First Amendment rights; and (2) the subpoena of Petitioner's prison phone records did not violate his Fourth Amendment rights. *Id.* at 367-368.

In Claim One of this proceeding, Petitioner contends that the State illegally obtained his recorded prison phone calls because there were insufficient facts to justify the issuance of a subpoena for the recordings.  Petitioner uses the same language that his attorney used when

challenging the Superior Court's denial of his suppression motion on direct appeal.  Given the

State's and Delaware Supreme Court's treatment of the argument, the Court liberally construes

Petitioner's argument in Claim One as contending that the Superior Court erred in refusing to

suppress the phone call recordings because it improperly determined that the issuance of the

subpoena to obtain them did not violate his First and Fourth Amendment rights.

The Fourth Amendment to the United States Constitution protects "[t]he right of the

people to be secure in their persons, houses, papers, and effects, against unreasonable searches

and seizures. .. and no Warrants shall issue, but upon probable cause...."  U.S. Const. amend. IV.

"The basic purpose of this Amendment, as recognized in countless decisions of [the Supreme]

Court, is to safeguard the privacy and security of individuals against arbitrary invasions by

government officials."  *Camara v. Mun. Court of San Francisco*, 387 U.S. 523, 528 (1967).

"Though there has been general agreement as to the fundamental purpose of the Fourth

Amendment, translation of the abstract prohibition against 'unreasonable searches and seizures'

into workable guidelines for the decision of particular cases is a difficult task which has for many

years divided the members of [the Supreme] Court."  *Id*.  at 528–29.  Notably, the Supreme

Court has held, "Prisoners have no legitimate expectation of privacy and ... the Fourth

Amendment's prohibition on unreasonable searches does not apply in prison cells."  *Hudson v.

Palmer*, 468 U.S. 517, 530 (1984); *Doe v. Delie*, 257 F.3d 309, 316 (3d Cir. 2001) ("The

Supreme Court has concluded that the Fourth Amendment right to privacy, to be free from

unreasonable searches, is fundamentally inconsistent with incarceration.").

The First Amendment guarantees freedom of speech and protects "against unjustified

governmental interference with the intended communication."  *Procunier v. Martinez*, 416 U. S.

14

at 408-09.  However, "inspection of [an inmate's] personal mail for contraband serve[s] a legitimate purpose and [does] not violate his first amendment rights."  *Martin v. Tyson*, 845 F.2d 1451, 1457 (7th Cir. 1988).  Relatedly, the Third Circuit has held, "Prisoners have no right to unlimited telephone use, and reasonable restrictions on telephone privileges do not violate their First Amendment rights."  *Almahdi v. Ashcroft*, 310 F. App'x 519, 522 (3d Cir. 2009); *see also Fennell v. Horvath*, 2019 WL 1981403, at *5 (E.D. Pa. May 3, 2019) (noting that "courts in our Circuit recognize prison inmates do not have a First Amendment right of freedom from monitoring and recording their phone calls, excepting calls with inmates' attorneys.").

Although Claim One asserts that the issuance of the subpoena violated Petitioner's First and Fourth Amendment rights, the Claim's essential argument is that the Superior Court erred by denying Petitioner's motion to suppress his recorded phone calls.  Notably, First Amendment concerns relating to warrants and the seizure of instruments of crime or contraband become part of the Fourth Amendment analysis because, under the Fourth Amendment, the court must "examine what is 'unreasonable' in the light of the values of freedom of expression."  *Roaden v. Kentucky*, 413 U.S. 496, 504 (1973).  When viewed in context, Petitioner's sub-arguments concerning the Delaware state courts' alleged improper factual and constitutional analyses appear to constitute his expression of dissatisfaction for the reasoning behind the Superior Court's denial of the suppression motion.

With this legal framework in mind, the Court views the Supreme Court decision, *Stroud v. United States*, as providing the most relevant precedent for determining the true nature of the instant issue.  *See Stroud v. United States*, 251 U.S. 15, 21 (1919).  In *Stroud*, the Supreme Court held that an inmate's outgoing letters – containing  inculpatory information and read by jailers

pursuant to jail practice – could be introduced against the inmate at trial without violating his Fourth Amendment rights. *Id*. at 21-22. Given these circumstances, the fact that Petitioner's motion to suppress invoked the First Amendment in aid of a Fourth Amendment illegal seizure of evidence claim does not transform the nature of Claim One to something other than the typical Fourth Amendment claim challenging a state court's failure to exclude allegedly improperly obtained evidence. *See, e.g., United States v. Mohamud*, 843 F.3d 420, 431 (9th Cir. 2016) (noting that "the district court correctly rejected Mohamud's First Amendment challenge, as motions to suppress based on First Amendment violations are analyzed under the Fourth Amendment.").

Pursuant to *Stone v. Powell*, Fourth Amendment claims are not cognizable on federal habeas review if the petitioner had a full and fair opportunity to litigate the claim in the state court. *See Stone v. Powell*, 428 U.S. 465, 494 (1976); *see also Wright v. West*, 505 U.S. 277, 293 (1992). A petitioner is considered to have had a full and fair opportunity to litigate such claims if the state has an available mechanism for suppressing evidence seized in or tainted by an illegal search or seizure, irrespective of whether the petitioner actually availed himself of that mechanism. *See U.S. ex rel. Hickey v. Jeffes*, 571 F.2d 762, 766 (3d Cir. 1978); *Boyd v. Mintz*, 631 F.2d 247, 250 (3d Cir. 1980). Conversely, a petitioner has not had a full and fair opportunity to litigate a Fourth Amendment claim, and therefore avoids the *Stone* bar, if the state system contains a structural defect that prevented the state court from fully and fairly hearing the petitioner's Fourth Amendment argument. *See Marshall v. Hendricks*, 307 F.3d 36, 82 (3d Cir. 2002). Notably, "an erroneous or summary resolution by a state court of a Fourth Amendment claim does not overcome the [*Stone*] bar." *Id*.

In this case, Petitioner filed a pre-trial motion to suppress the recordings of his phone calls pursuant to Rule 41 of the Delaware Superior Court Rules of Criminal Procedure.  The Superior Court denied the suppression motion after conducting a hearing.  Petitioner then challenged that decision in his direct appeal to the Delaware Supreme Court, presenting the same arguments raised in the instant Petition.  The Delaware Supreme Court affirmed the Superior Court's judgment after rejecting Claims One and Two as meritless.  *See Whitehurst,* 83 A.3d at 366-68.

This record clearly demonstrates that Petitioner was afforded a full and fair opportunity in the Delaware state courts to litigate his argument that his recorded phone calls were illegally provided to the State.  The fact that Petitioner disagrees with the state court decisions and the reasoning utilized by the state courts is insufficient to overcome the *Stone* bar.  Therefore, the Court will deny Claim One as barred by *Stone*.

Despite the foregoing, the Court cannot ignore the somewhat unique casting of Petitioner's instant argument as a First Amendment challenge to the State's subpoena power and its effect on the suppression or, as in this case, the non-suppression, of evidence obtained via a subpoena.  Consequently, the Court will exercise prudence and also independently consider whether the Delaware Supreme Court reasonably applied clearly established Federal law when holding that the Superior Court's denial of the suppression motion did not violate Petitioner's First Amendment rights.

"'[C]learly established Federal law' . . . includes only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions."  *Woods v. Donald*, 575 U.S. 312, 317 (2015).  The Court notes that the Supreme Court precedent relied upon by the Delaware Supreme Court when

17

rejecting Claim One during Petitioner's appeal – *Procunier v. Martinez* – involves mail sent from inmates to persons outside of prison, not the monitoring and transmission of inmates' telephone calls.  In fact, there is no Supreme Court precedent directly addressing the constitutional implications concerning the transmission of an inmate's recorded telephone calls to the prosecution, nor any Supreme Court decision involving facts "materially indistinguishable" from those presented here.  Consequently, the Delaware Supreme Court's denial of Claim One was not contrary to clearly established federal law.  *See Woods*, 575 U.S. at 317 ("Because none of our cases confront 'the specific question presented by this case,' the state court's decision could not be 'contrary to' any holding from this Court.").

In the absence of a Supreme Court case directly on point, the Court's next inquiry is whether the Delaware Supreme Court unreasonably applied clearly established general principles regarding the First Amendment rights of prisoners to the circumstances of Petitioner's case. While there is no Supreme Court precedent specifically addressing an inmate's constitutional rights with respect to phone calls, there is precedent addressing an inmate's constitutional rights with respect to other forms of communication.  For instance, the Supreme Court has held that "a prison inmate retains those First Amendment rights [of freedom of speech and association] that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."  *Pell v. Procunier*, 417 U.S. 817, 822 (1974) (evaluating constitutionality of limiting one channel of communication with those outside of prison through review of adequacy of alternative channels of communication); *see also Thornburgh v. Abbott*, 490 U.S. 401 (1989) (evaluating regulations governing receipt of subscription publications by federal prison inmates).  Nevertheless, restrictions on inmates' speech are constitutional if they

are "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).  Restrictions placed on an inmate's outgoing mail will not violate the First Amendment if: (1) the contested actions furthered an important or substantial government interest unrelated to the suppression of expression; and (2) the contested actions were no greater than necessary for the protection of that interest.  *See Procunier v. Martinez*, 416 U.S. at 413.

In 2009, the Delaware Supreme Court explicitly adopted the *Procunier v. Martinez* test to address whether the State's seizure of outgoing prisoner mail was proper.  *See Johnson I*, 983 A.2d at 922.  Then, in 2012, the Delaware Supreme Court expressly applied the *Johnson I* test (and therefore the *Procunier v. Martinez* test) when determining the propriety of seizing outgoing prisoner telephone calls.  *See Johnson II*, 2012 WL 3893524, at *1-2 (Del. Sept. 7, 2012).  To the extent the Court should view Claim One as alleging a First Amendment violation independent of the previously discussed Fourth Amendment violation, the Court concludes that the Delaware Supreme Court reasonably extended *Procunier*'s two-part test for out-going mail to determine the reasonableness of the subpoena issued to collect Petitioner's phone calls.

The Court further concludes the Delaware Supreme Court reasonably applied clearly established Federal law when it determined that the State's criminal investigation of Petitioner and Mahaley's possible witness tampering constituted a substantial government interest unrelated to the suppression of Petitioner's expression.  *See, e.g., Perez v. Fed. Bureau of Prisons*, 229 F. App'x 55, 57 (3d Cir. 2007) (holding a "prisoner's right to telephone access is subject to rational limitations in the face of legitimate security interests of the penal institution."). It is well-established that the government has a legitimate substantial interest in protecting the integrity of an ongoing criminal investigation, such as that achieved by preventing witness

19

tampering.  *See United States v. Warrant*, 2017 WL 3669564, at *5 (D.N.J. Aug. 15, 2017)

("Courts have recognized the Government's compelling interest in protecting the integrity of

criminal investigations […] in multiple contexts."); *Oliver v. Elliot*, 2015 WL 2354565, at *2 (D.

Mont. May 15, 2015) (noting the "government has a legitimate interest in preventing witness

tampering."); *United States v. Hunter*, 2013 WL 593768, at *4 (D. Minn. Jan. 16, 2013) (finding

that administrative segregation did not violate pretrial detainee's due process rights because it

was rationally related to the legitimate government interest of preventing witness tampering).

Simply stated, the First Amendment does not shield an inmate's expression of threats to

government witnesses.  *See United States v. Parker*, 871 F.3d 590, 605 (8th Cir. 2017); *see also*

*Butti v. Unger*, 2005 WL 1676739, at *3 (S.D.N.Y. July 15, 2005) (holding that the admission of

evidence obtained through a prison mail watch did not violate Butti's First Amendment rights,

because the "temporary surveillance of Butti's mail was based on a reasonable suspicion of his

continuing criminal activity, and was reasonably related to legitimate penological interests.")

     The record supports the Delaware state courts' determination that there were sufficient

facts for issuing the subpoena.  During the suppression hearing, Petitioner argued that the State's

subpoena was overly broad because it did not limit the requested recordings with particularity to

the conversations between Petitioner and Mahaley, and also that the subpoena was unreasonable

because there was an insufficient foundation of evidence that Petitioner was involved in any

potentially illegal or unlawful acts performed by Mahaley.  (D.I. 13-2 at 4)  The State identified

the pertinent issue as follows: "as the case law is clear [] the question's ultimately going to be

before the Court, did the State go on a fishing expedition or did they have a valid reason to

subpoena the prison phone calls."  (D.I. 13-1 at 29)  The Superior Court asked the State why,

given the absence of an allegation that someone in addition to Mahaley contacted Bey to

encourage him not to show up for trial, the subpoena was not narrowed to focus on the phone

calls from Petitioner to Mahalaey. *Id*. The State responded, "Your Honor – one of the problems

that we're noticing with the prison phone calls is that there's no way to prevent three-way calls

from being made. And they're made in lots of phone calls. So even if the defendant called his

mom, his mom could still three-way in Natasha Mahaley under those phone calls. So limiting

them to the number that is listed as Natasha Mahaley doesn't mean that those are the only phone

calls that he actually talks to Natasha Mahaley." (D.I. 13-1 at 39) The Superior Court denied the

motion to suppress the recording of the phone calls for the following reason:

> The question is did the action further an important government
> interest unrelated to the suppression of expression, and was the
> action no greater than needed to protect the interest. As noted
> correctly by the State, the standard was initially adopted with respect
> to outgoing prison mail, but the Delaware Supreme Court recently
> adopted this same test for inmate prison calls.
>
> In this case, the action of subpoenaing [Petitioner's] prison calls
> furthers what I view -- and share the State's view of -- is this was an
> important government interest unrelated to the   suppression of
> expression. The State had a legitimate, valid concern that agents or
> [Petitioner] and or agents, were tampering with at least one witness,
> a key witness, the alleged victim, was advised he received a phone
> call from the defendant's girlfriend. That's established that
> relationship, that it's a girlfriend/boyfriend with Natasha Mahaley,
> regarding the pending prosecution.
>
> The defense makes much of the fact that there were no overt threats
> or menace in the phone call, but I don't think that that level of
> coercion  or menacing or malice is required under the case  law. I
> think it's enough that there was an attempt  to contact a key witness
> in this trial, and after [Petitioner] had been indicted on the attempted
> murder-related offenses.
>
> I think it's also important to note in this case that the State had what
> I deemed to be legitimate and valid concerns about the unknown

conspirator, the alleged unknown conspirator. The video surveillance and the alleged victim's statement established that there was a second participant in this crime, and that that second suspect entered and exited the motel room at the same time as [Petitioner]. It's important and critical to note this co-conspirator has never been arrested, or even identified, and that the State has ample reason to believe that [Petitioner] knows the co-conspirator's identity.

So, I find that the State has a legitimate and reasonable interest in trying to locate the co-conspirator, recover the firearm, and put an end to any suspected witness-tampering so that there could be a fair trial of this -- of these charges. So, I find that the State had legitimate reasons, reasonable reasons to subpoena [Petitioner's] phone calls. So, the State's motion -- or it was a defense motion, right, to suppress the prison phone calls is denied, and [defense counsel], all your arguments are preserved.

(D.I. 13-2 at 4-5)

As set forth above, the transcript of the suppression hearing supports the Superior Court's conclusion that the scope and purpose of the subpoena were reasonable, and that the issuance of the subpoena furthered an important government interest unrelated to the suppression of Petitioner's expression. Given the facts of the case, the Delaware Supreme Court reasonably applied the underlying principles of *Procunier* and other clearly established Federal law in holding that Petitioner's challenge to the issuance of the subpoena failed to state a First Amendment claim.

For all of these reasons, the Court will deny Claim One in its entirety.

**B.  Claim Two:  The Improper Admission of Petitioner's Recorded Phone Calls Deprived him of a Fair Trial**

In Claim Two, Petitioner contends that the admission of the illegally obtained prison phone calls violated his right to due process. Petitioner presented this argument to the Delaware Supreme Court on direct appeal. The Delaware Supreme Court concluded that it did not need to

22

address the argument given its determination that Petitioner's argument regarding the improper

admission of the recorded prison phone calls lacked merit.  Similarly, the Court in this

proceeding has just concluded that the Superior Court did not violate Petitioner's federal

constitutional rights by denying his motion to suppress the recorded prison calls.  Therefore,

Claim Two lacks merit for this reason alone.

Nevertheless, even if the Superior Court erred in denying the suppression motion – which

it did not – such error was harmless and did not violate Petitioner's due process rights.  As a

general rule, state court evidentiary rulings are not cognizable on federal habeas review unless

the petitioner shows the admission of evidence caused a fundamental unfairness at trial in

violation of his due process rights.  *See Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  In other

words, the unconstitutional admission of evidence in a state proceeding will not warrant federal

habeas relief unless the evidentiary ruling is so prejudicial that it "had substantial and injurious

effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 623

(1993); *see Hassine v. Zimmerman*, 160 F.3d 941, 953 (3d Cir. 1998) (holding that the harmless

error standard of *Brecht* applies on habeas review); *Kontakis v. Beyer*, 19 F.3d 110, 120 (3d Cir.

1994).  "Under *Brecht* and its progeny, a constitutional trial error is not harmless if the court is in

'grave doubt' as to whether the error had a substantial and injurious effect or influence in

determining the jury's verdict."  *Hassine*, 160 F.3d at 955.

The premise of Petitioner's instant due process challenge is that the denial of suppression

motion expanded the scope of admissible evidence for the witness tampering charges and the

underlying robbery and burglary charges.  Petitioner, however, is incorrect.  The evidence of

Petitioner's guilt regarding witness tampering would have been admissible regardless of whether

the recorded prison phone calls were admitted.  *See Whitehurst*, 83 A.3d at 365.  For instance,

Jessica Harvey and a member of her family, Gloria Harvey, were witnesses, and both still would

have been able to testify that Mahaley threatened to harm them if Jessica Harvey appeared in

court.  Bey still would have been able to testify that Mahaley had called him and attempted to

persuade him to not appear in court.  Kiyona Turner still would have been able to testify that

Petitioner told her to go to court and say that he [Petitioner] had been in the room with the baby

when the incident occurred.  Finally, Petitioner himself testified at trial that he had engaged in

witness tampering.  *Id*.  In sum, although the recorded telephone calls provided additional

evidence of Petitioner's guilt, the admission of the recordings did not expand the scope of

admissible evidence regarding the witness tampering.

      Additionally, the admission of the recorded telephone calls would not have prevented the

admission of the following overwhelming evidence showing that Petitioner committed the

underlying robbery and other offenses:

- Before the robbery, Petitioner asked "Uncle Butter" Tyrone Brown if he had a gun because Petitioner was "going to knock off the joker around the corner." (D.I. 12-1 at 50-52)

- Petitioner also approached Chris White ("White") and suggested that that they "get" or rob Bey. (D.I. 13-2 at 25-30)

- The video of the events at the Budget Inn revealed that Mahaley spoke to the unidentified co-conspirator, walked back to room 109 with him, returned to her room, and a moment later [Petitioner] exited the room and went to room 109, where he and the unidentified co-conspirator lined up in tactical formation before entering room 109. (D.I. 13-2 at 11-13, 21-26, 54-56)

- Petitioner admitted being present when Bey was robbed. Although he claimed to be a mere bystander to the robbery,

Petitioner never explained how Bey's blood ended up on his sweatshirt when he was "backed up against the wall." (D.I. 13-2 at 66-74)

- Both Bey and Harvey testified that the unidentified co-conspirator was holding the gun and Bey was the person on top of Bey "running his pockets." (D.I. 12-1 at 64-65, 77-79A)

Based on the foregoing, the Court concludes that Petitioner has not shown that the admission of his recorded phone calls had a substantial and injurious effect or influence in determining the jury's verdict. Accordingly, the Court will deny Claim Two.

## C. Claim Three: The Superior Court Erred By Not Providing a Missing Evidence Instruction

In Claim Three, Petitioner contends that the Superior Court erred by failing to provide a missing evidence instruction to the jury regarding the Budget Inn surveillance video. He argues that "law enforcement failed to preserve the digital material and negligently entrusted their obligation to obtain evidence in the case to the staff of the Budget Inn." (D.I. 1 at 11) He also contends that the video would have been "subject to production pursuant to Superior Court Rule of Criminal Procedure 16 and *Brady v. Maryland*." (D.I. 1 at 11)

Petitioner presented his argument regarding the missing evidence instruction to the Superior Court in his Rule 61 motion as the basis for an ineffective assistance of appellate counsel claim. *See Whitehurst*, 2016 WL 1424502, at *7. The Superior Court held that appellate counsel did not render ineffective assistance by failing to raise the issue of the missing evidence instruction, because the facts of the case demonstrated Petitioner was not entitled to such an instruction. *Id*. at *11. On post-conviction appeal, Petitioner did not re-assert his ineffective assistance of counsel claim. Instead, he argued for the first time that the State had a duty under

25

*Brady v. Maryland*, 373 U.S. 83 (1963) to obtain and disclose the surveillance video.[4]  (D.I.  12-2 at 21-27)  Without addressing the subtle difference in Petitioner's complaint about the surveillance video, the Delaware Supreme Court affirmed the Superior Court's decision "on the basis of and for the reasons assigned by the Superior Court in its well-reasoned Opinion and Order dated March 31, 2016."  *Whitehurst*, 2016 WL 6803774, at *1.  In these circumstances, the Court must review Claim Three *de novo*.[5]  *See Breakiron v. Horn*, 642 F.3d 126, 131 (3d Cir. 2011) (explaining that a habeas claim must be reviewed *de novo* if the state's highest court did not adjudicate the merits of an exhausted claim that is otherwise properly before the court).

The following facts are relevant to the instant issue.

> The Budget Inn had a video surveillance system that captured activity outside of the room where the shooting occurred.  Detective Brown testified that he responded to the Budget Inn following the shooting and, along with other officers, reviewed the video footage. Detective Brown personally attempted to download the surveillance video to a Universal Serial Bus ("USB") drive. Detective Brown stated that "after a substantial amount of time" the download appeared to be complete. Detective Brown then testified that he called the video surveillance installer to determine how long the

---

[4]A violation of *Brady* occurs when the government fails to disclose evidence materially favorable to the accused, including both impeachment evidence and exculpatory evidence. *See United States v. Bagley*, 473 U.S. 667, 676 (1985).  In order to prevail on a *Brady* claim, a petitioner must establish that: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or it had impeachment value; (2) the prosecution suppressed the evidence, "either willfully or inadvertently"; and (3) the evidence was material.  *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Lambert v. Blackwell*, 387 F.3d 210, 252 (3d Cir. 2004).  A petitioner demonstrates materiality of the suppressed evidence by showing a "reasonable probability of a different result." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  In turn, "a reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id*.

[5]*De novo* review means that the Court "must exercise its independent judgment when deciding both questions of constitutional law and mixed constitutional questions." *Williams v. Taylor*, 529 U.S. 362, 400 (2000) (Justice O'Connor concurring).

surveillance camera footage would be stored on the Budget Inn's system before deletion.  The installer informed Detective Brown that it would be deleted after thirty days from the date of the incident.  When Detective Brown returned to Troop 2 and attempted to play the downloaded files, he received an error message and was unable to play any of the files.  Detective Brown, nine days after the incident, on October 28, 2011, returned to the Budget Inn in order to again try to download the video files.  Even though Detective Brown returned before the expiration of thirty days, the video files had been erased.  This video was, therefore, not available for trial.

\*                                  \*                                  \*

At trial, the State presented the testimony of several Delaware State Police to describe the contents of the surveillance video.  Specifically, three officers, Detective Christian Brown, Detective Tenebruso, and Detective Steve Rizzo ("Detective Rizzo"), viewed the video on October 20, 2011, immediately following the shooting.  Each detective saw a male exit room 211 and meet with an unknown male outside of Harvey's room.  Detective Tenebruso identified the male emerging from room 211 as [Petitioner]. Detective Tenebruso had patrolled the Budget Inn area for nine years and recognized [Petitioner] by his build and gait.  The detectives all testified that the unknown male seen with [Petitioner] carried what appeared to be a rifle or a "long gun."  At trial, the detectives described the two men entering Harvey's room. Both Detective Brown and Detective Rizzo stated that they lined up against the wall in tactical SWAT formation.  Detective Tenebruso stated that [Petitioner] and the unknown male "stormed into the room at a quick pace."  The detectives then stated that both men exited the room shortly thereafter.  Detectives Brown and Tenebruso testified to seeing Harvey exit the room, followed by Bey.

*Whitehurst*, 2016 WL 1424502, at \*4–6.  The record reveals that trial counsel filed a motion for a missing evidence instruction prior to trial, which the Superior Court denied because the "State was never in possession of the video, there was no evidence of negligence or bad faith with respect to the police officers' efforts to retrieve or secure the video, and the police officers' reliance on the representations made by the Budget Inn's employee and the DVR installer was not unreasonable."  *Whitehurst*, 2016 WL 1424502, at \*9; (D.I. 12-5 at 112).  Petitioner renewed

27

the motion at the close of the defense's case, and the Superior Court denied the motion, stating it had "reviewed the case law and [was] satisfied under the facts and circumstances that [the instruction] should not be given." (D.I. 13-1 at 119)

In Petitioner's Rule 61 proceeding, within the context of an ineffective assistance of appellate counsel claim, the Superior Court reviewed Petitioner's argument concerning the surveillance video under well-established Delaware precedent – *Deberry v. State*, 457 A.2d 744 (Del. 1983) – and again determined that a missing evidence instruction was not warranted and that the State did not breach a duty to preserve the surveillance video. In *Deberry,* the Delaware Supreme Court held that the State, including its police agencies, is obligated under the Delaware constitution's due process standards to preserve evidence material to a defendant's guilt or innocence. *See Lolly v. State*, 611 A.2d 956, 959–60 (Del.1992). The Delaware Supreme Court later extended the "more exacting standard based on Delaware constitutional norms" of *Deberry* to claims that the police had failed to gather the possibly exculpatory evidence in the first place. *Id*. at 957, 960. Basically, once the state court establishes that the "State must bear the responsibility for the loss of [or failure to gather] material evidence, an appropriate jury instruction is required as a matter of due process under the Delaware constitution." *Id*. at 961. A missing evidence instruction requires "the jury to infer that, had the evidence been preserved [or procured], it would have been exculpatory to the defendant." *Lunnon v. State*, 710 A.2d 197, 199 (Del. 1998).

A state court's failure to give a particular jury instruction will only warrant habeas relief if the error was not harmless, that is, if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637; *see Lewis v. Pinchak*, 348 F.3d 355,

359 (3d Cir. 2003) (holding that the harmless error analysis applies to a court's refusal to give a jury instruction).  A federal court may not grant habeas relief on the basis that the jury instruction was allegedly incorrect under state law,[6] and "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."  *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

Since the basis for Petitioner's argument is state law, habeas relief is not warranted.  But even if that was not a roadblock to relief, Petitioner's argument would fail.

After reviewing the record in this case, the Court concludes that the absence of a missing evidence did not deprive Petitioner of due process or a fair trial.  The record demonstrates that the Superior Court reasonably concluded: (1) the State's failure to obtain possession of the surveillance video was not due to bad faith or negligence; (2) the State did not have a duty to preserve the surveillance video because it never had possession of the video; and (3) given Petitioner's testimony and the testimony of other witnesses,[7] the surveillance tape "appear[ed] to contain no exculpatory evidence."  *Whitehurst*, 2016 WL 1424502, at *10.  Since the surveillance tape did not contain exculpatory evidence, the State's duty to disclose such evidence under *Brady v. Maryland* was never triggered.  In addition, the evidence adduced at trial "overwhelmingly supported a conviction."  *Whitehurst*, 2016 WL 1424502, at *10.  Given all of

---

[6]*See Estelle*, 502 U.S. at 71-72.

[7]The State presented Detective Brown's testimony as to how and why the video surveillance was not preserved.  Detective Brown testified that, due to the length of the motel surveillance video, he downloaded a copy to a USB.  He also asked the motel staff how long the video would be preserved, and was told 30 days.  However, when Detective Brown returned to the station he was unable to play any of the files downloaded onto the USB.  Brown also testified that he returned to the motel 8 days later to download the video again, but the surveillance video had been deleted. *See Whitehurst*, 2016 WL 1424502, at *4.

these circumstances, Petitioner has failed to demonstrate that the absence of a missing evidence instruction had a substantial and injurious effect on the fairness of his trial.  Accordingly, the Court will deny Claim Three as meritless.

### D.   Claim Four:  Improper Admission of Identification and Hearsay Testimony

In Claim Four, Petitioner contends that the Superior Court erred in denying his motion to suppress identification testimony and in admitting witness hearsay testimony that contributed to Petitioner's in-court identification.  (D.I. 1 at 13)  Petitioner asserts that, during the suppression hearing on September 14, 2012, the "trial court allowed Detective Steven Rizzo to testify about what a key witness for the State assumed and thought of the identification of [Petitioner]."  (D.I. 1 at 13)[8]  The record reveals, and Petitioner concedes, that he did not exhaust state remedies for this claim because he did not present the issue to the Delaware Supreme Court on direct or post-conviction appeal.  At this juncture, any attempt by Petitioner to raise Claim Four in a new Rule 61 motion would be barred as untimely under Delaware Superior Court Criminal Rule 61(i)(1).  *See DeAngelo v. Johnson*, 2014 WL 4079357, at *12 (D. Del. Aug. 15, 2014).  Although Rule 61(i)(1) provides for an exception to the one-year time limitation if the untimely Rule 61 motion "asserts a retroactively applicable right that is newly recognized after the judgment of conviction is final," no such right is implicated in the instant Claim.  Similarly, the exceptions to Rule

---

[8] As the State points out, Petitioner does not specify exactly what evidence he is talking about in this allegation, and since it was not previously raised, the prior proceedings do not identify it either.  It appears to be the case, nevertheless, that Petitioner is discussing the suppression hearing (D.I. 12-1 at 21-40) during which Detective Rizzo was expected to testify about what Bey told him.  (*See id*. at 23) ("Officer Rizzo is going to [make] hearsay statements in relation to what Mr. Bey has to say without he benefit of cross-examination.").  Such testimony followed.  (*Id*. at 25).  Defense counsel generally objected to the testimony on the basis of the Confrontation Clause, but did not object to any specific questions.

61(i)(1)'s time-bar contained in Rule 61(i)(5) and (d)(2) do not apply to Petitioner's case, because he does not allege actual innocence, lack of jurisdiction, or that a new rule of constitutional law applies to this Claim.

Since Petitioner is precluded from exhausting Claim Four at this point, the Court must treat the Claim as technically exhausted but procedurally defaulted.  Consequently, the Court cannot review the merits of Claim Four absent a showing of cause for the default, and prejudice resulting therefrom, or upon a showing that a miscarriage of justice will occur if the Claims are not reviewed.

Petitioner does not explain why he did not present Claim Four in his initial *pro se* Rule 61 motion or in his *pro se* Rule 61 appeal.  To the extent Petitioner cites *Martinez v. Ryan*, 566 U.S. 1 (2012), in an attempt to establish as cause appellate counsel's failure to raise the issue on direct appeal and, relatedly, post-conviction counsel's related failure to raise the ineffective assistance of appellate counsel claim in his Rule 61 motion, it is unavailing.  In *Martinez*, the Supreme Court held for the first time that inadequate assistance of counsel during an initial-review state collateral proceeding may establish cause for a petitioner's procedural default of a claim of ineffective assistance of trial counsel.  *Id*. at 16-17.  In order to obtain relief under *Martinez*, a petitioner must demonstrate that the state post-conviction attorney in his first state collateral proceeding was ineffective under the standards established in *Strickland*, that the underlying ineffective assistance of trial counsel claim is substantial, and that petitioner was prejudiced.  *Id*. at 9-10, 16-17.  A "substantial" ineffective assistance of trial counsel claim is one that has "some merit" which, given the *Martinez* Court's citation to *Miller-El v. Cockrell*, 537

31

U.S. 322 (2003), appears to be governed by the standards applicable to certificates of appealability.  *Id*. at 14-15.

Here, the *Martinez* rule is inapplicable because it only provides a method of establishing cause for a failure to raise an ineffective assistance of trial counsel claim, and Claim Four does not allege ineffective assistance of counsel.  In the absence of cause, the Court need not address the issue of prejudice.  Petitioner also has not satisfied the miscarriage of justice exception to the procedural default doctrine, because he has not provided new reliable evidence of his actual innocence.  Accordingly, the Court will deny Claim Four as procedurally barred from federal habeas review.

## IV.     CERTIFICATE OF APPEALABILITY

A district court issuing a final order denying a § 2254 petition must also decide whether to issue a certificate of appealability.  *See* 3d Cir. L.A.R. 22.2 (2011).  A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court has concluded that the instant Petition does not warrant relief.  In the Court's view, reasonable jurists would not find this conclusion to be debatable.  Accordingly, the Court declines to issue a certificate of appealability.

## V.     CONCLUSION

For the reasons discussed, the Court concludes that the Petition must be denied.  An appropriate Order will be entered.